**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
------------------------------------------------------------X
NAT SCHLESINGER, GOODMARK
INDUSTRIES, INC.,

                            Petitioners,            **MEMORANDUM OF**
                                               **DECISION AND ORDER**
                 -against-                     09-CV-4278 (ADS)

UNITED STATES OF AMERICA,

                            Respondent.
------------------------------------------------------------X

**APPEARANCES:**

**Andrew J, Frisch, Esq.**
*Attorney for the petitioner*
950 Third Avenue, 15th Floor
New York, NY 10022

**Jeremy L. Gutman, Esq.**
Attorney for the petitioner
233 Broadway, Suite 2707
New York, NY 10279

**Loretta A. Lynch, United States Attorney**
**for the Eastern District of New York**
*Attorneys for the respondent*
610 Federal Plaza
Central Islip, NY 11722
      By: Richard T. Lunger, Assistant United States Attorney

**SPATT, District Judge**.

      Nat Schlesinger ("Schlesinger" or "the petitioner") petitions this Court for a writ of

habeas corpus, pursuant to 28 U.S.C. § 2255, seeking to vacate or set aside his conviction and

sentence on the ground that he received ineffective assistance of counsel. For the reasons

discussed below, Schlesinger's petition is denied.

# I. BACKGROUND

On May 15, 2006, a jury convicted Nat Schlesinger on twenty-eight counts of mail fraud conspiracy, substantive mail and wire fraud, money laundering conspiracy, and substantive money laundering, arising out of, among other acts, a series of five fires dating back to 1987 that occurred at a clothing factory in the Williamsburg section of Brooklyn that was owned and maintained by Nat Schlesinger and his brother Jack Schlesinger. Schlesinger was also convicted of arson in connection with a December 31, 1998 fire at the factory ("the December 31, 1998 fire"), in violation of 18 U.S.C. § 844(i), and for the use of fire to commit a felony, in violation of 18 U.S.C. § 844(h)(1). Specifically, the jury convicted Schlesinger of deliberately causing the fire in the factory on the night of December 31, 1998 for the purpose of submitting a false and inflated insurance claim.

Presently before the Court is Schlesinger's fourth attempt to collaterally attack his arson conviction. The facts of this case and the testimony at the trial were extensively recounted in the Court's decision on Schlesinger's motion for judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29 ("Rule 29"), United States v. Schlesinger ("Schlesinger I"), 372 F. Supp. 2d 711 (E.D.N.Y. 2005), and his third motion for a new trial pursuant to Federal Rule of Criminal Procedure 33 ("Rule 33"), United States v. Schlesinger ("Schlesinger II"), 438 F. Supp. 2d 76 (E.D.N.Y. 2006).

On October 5, 2009, Schlesinger brought the instant petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2255. Schlesinger alleges that his defense counsel at trial, Douglas Burns, Esq. and Randy Zelin, Esq. ("trial counsel") were constitutionally ineffective because they failed to: (1) investigate the arson; (2) challenge the testimony of Thomas J. Russo and Fire Marshal Bernard Santangelo ("the arson experts" or "the government's experts") at a Daubert

hearing based on their use of the "negative corpus" methodology; (3) conduct meaningful cross-examination of the arson experts and/or call a defense expert to refute the arson allegations.

By way of background, "'[n]egative corpus,' short for negative *corpus delicti*, is fire investigator shorthand for the determination that a fire was incendiary based on the lack of evidence of an accidental cause." 5 Faigman, Kaye, Saks & Sanders, Modern Scientific Evidence: The Law and Science of Expert Testimony § 39:65 (2011–12 ed.) ("Modern Scientific Evidence "). The National Fire Protection Association ("NFPA") is an international nonprofit that now, among other things, promotes codes and standards "intended to minimize the possibility and effects of fire and other risks." National Fire Protection Association, Codes & Standards, http://www.nfpa.org (last visit February 2, 2012). In 1992, the Technical Committee on Fire Investigations issued NFPA 921, a "Guide for Fire and Explosion Investigations" ("NFPA 921"). Under the version of NFPA 921 applicable at the time of Schlesinger's trial, the guidelines set forth certain circumstances under which an investigation method known as "process of elimination" could be used to determine the cause of a fire. Specifically, the 2004 version of NFPA 921 provided:

> 18.2.1 Any determination of fire cause should be based on evidence rather than on the absence of evidence; however, when the origin of a fire is clearly defined, it is occasionally possible to make a credible determination regarding the cause of the fire, even when there is no physical evidence of the ignition source available. This finding may be accomplished through the credible elimination of all other potential ignition sources provided that the remaining ignition source is consistent with all known facts.
>
> 18.2.3 Elimination, which actually involves the developing, testing and rejection of alternate hypotheses, becomes more difficult as the degree of destruction in the compartment of origin increases, and it is not possible in many cases. Whenever an investigator proposes the elimination of a particular system or appliance as the ignition source on the basis of appearance or visual observation, the investigator should be able to explain how the appearance or

3

> condition of that system or appliance would be different from what
> is observed, if that system or appliance were the ignition source for
> the fire.

NFPA 921 (2004). The most recent version of NFPA 921 issued in 2011 differentiates its

process of elimination from negative corpus methodology, defining negative corpus as "[t]he

process of determining the ignition source for a fire, by eliminating all ignition sources found,

known, or believed to have been present in the area of origin, and then claiming such

methodology is proof of an ignition source or which there is no evidence of its existence".

NFPA 921, § 18.6.5 (2011). In addition, the 2011 edition explicitly rejects the use of negative

corpus to classify the cause of a fire, stating:

> This process is not consistent with the Scientific Method, is
> inappropriate, and should not be used because it generates un-
> testable hypotheses, and may result in incorrect determinations of
> the ignition sources and first fuel ignited. Any hypotheses
> formulated for the casual factors (e.g., first fuel, ignition source,
> and ignition sequence), must be based on facts. Those facts are
> derived from evidence, observations, calculations, experiments,
> and the laws of science. Speculative information cannot be
> included in the analysis.

(Id.)

The focus of this petition is trial counsel's failure to investigate accidental causes of the

fire and to effectively challenge Russo and Santangelo's reliance on a "negative corpus"

methodology, rather than the guidelines set forth in NFPA 921, to reach the conclusion that the

December 31, 1998 fire was incendiary. In support of his petition, Schlesinger attached his own

affidavit, as well as affidavits from Abraham Weiser and Louis Pfeifer, identifying additional

information trial counsel could have obtained about other possible sources of the fire. In

addition, Schlesinger encloses affidavits from purported arson experts John J. Lentini, David

Smith, and Dennis Smith.

Because it is directly relevant to the instant petition, the Court briefly recounts the trial testimony of Russo, the electrical engineer James Pryor, Santangelo and Weiser as stated in Schlesinger II, the only difference being that all references to the "the defendant" have been changed to "the petitioner". In addition, the Court summarizes the affidavits submitted in support of the petition.

## A.  Trial Testimony

### 1.  Testimony of Thomas J. Russo and James Pryor

The primary investigation with regard to the December 31, 1998 fire was conducted by Thomas J. Russo of Russo Consultants, a cause and origin expert hired by Atlantic Mutual Insurance Co. ("Atlantic Mutual"). This company was retained to investigate and ascertain the origin and cause of the fire that occurred at the petitioner's factory on December 31, 1998. Russo had 24 years of prior experience both as a New York City Firefighter and Fire Marshal. On January 7, 1999, Russo first went to the scene of the fire at the factory to investigate, at which time he conducted a physical inspection of the premises. Russo determined that the origin of the fire was in the shipping area on the third floor.

Russo then investigated the cause of the fire. The on site inspection revealed that there were no appliances, candles, machinery, chemicals, smoking material, or heating units in the area of origin. He also determined that the entire building was secured when the fire department arrived in that all of the locks on the entrances to the factory were forced open by the fire department, and by reviewing the reports of the fire department indicating the use of force to gain entry to the building.

In order to assist his investigation, Russo hired James Pryor, an electrical engineer, to review the electrical system in the area of origin. The electrical engineer testified that he

determined that there were no electrical faults which could have caused the fire. Pryor testified that he inspected the circuit breaker panel which provided service to the area of the fire, as well as the wiring and lighting in the area of the fire. Pryor ruled out electrical causes for this fire. Russo also conducted witness interviews of Abraham Weiser and Jack Schlesinger. Weiser told him that he personally did not smoke and he did not observe anyone smoking on the third floor on December 31, 1998. He stated there were no candles, incense, oily rags, or cleaning agents in the area. Weiser stated that he did not notice anything unusual prior to departing and securing the area. Jack Schlesinger told Russo that a delivery man may have been on the third floor around 11:00 a.m. on December 31, 1998. He also stated that he, his brother Nat Schlesinger, and one other person were the only people with keys to the entire building.

As a result of his investigation, Russo concluded that the fire was intentionally set. Russo arrived at this conclusion by excluding all electrical and accidental causes. He was able to exclude cigarette smoking as a possible source of ignition for the following reasons: (1) there was no evidence that personnel smoked on the third floor; (2) there was no evidence of cigarettes on the third floor; and (3) the time between the last person exiting the building and the report of the fire was too long to support the inference that a kindling cigarette could have started the fire. Russo also excluded an act of God after research indicated that there were no earthquakes or thunderstorms. Russo further excluded the possibility that the roof mounted heater caused the fire upon examination of the unit, which showed no evidence of flame impingement or any other heat source coming from the unit. After excluding all accidental causes, Russo concluded that the December 31, 1998 fire was intentionally set.

## 2. Testimony of Fire Marshal Bernard Santangelo

New York City Fire Marshal Bernard Santangelo testified that he opened an investigation regarding the fire in March 1999, approximately three months after it occurred. The New York City Fire Marshal was initially requested to investigate the suspicious fire the night of the fire, but was unable to respond until the following Monday due to the New Year's holiday. When the Fire Marshal responded, a quick investigation was conducted and it was determined that the cause of the fire was "not ascertained." Due to lack of resources, the investigator at the time was unable to search under the partially collapsed mezzanine, and thus labeled the location of the fire as the third floor, origin unknown. Fire Marshal Santangelo re-opened the investigation several months later when he was contacted by Charles Radtke from Russo Consultants with regard to the suspicious fire.

After commencing the investigation, Fire Marshal Santangelo requested documents from the insurance company regarding its investigation and he attempted to interview both Jack Schlesinger and Nat Schlesinger. He testified that the petitioner repeatedly changed the date of the interview and delayed his appointment on several occasions. When the petitioner finally met with Fire Marshal Santangelo, the petitioner tape recorded the meeting without Fire Marshal Santangelo's knowledge. In the interview, Nat Schlesinger told Fire Marshal Santangelo that he was the "Manager of financial operations" and held no official position in the company or on the board of directors. The petitioner also refused to answer several questions and seemed irritated. Also, the petitioner responded to several questions by asking questions such as "who are you?" The petitioner told Fire Marshal Santangelo that he had a complete set of keys to the building and left the building around 6 or 7 p.m. the night of the fire. When asked about the claim history of the building, the petitioner stated that he could only recall one other fire which occurred in

1991 when the factory was operating as Private Brands. The petitioner also denied any involvement in Private Brands.

Fire Marshal Santangelo's investigation also considered the insurance claim submitted by Goodmark Industries. He determined that the petitioner submitted a fraudulent estimate of repair to the machinery. The estimate was drafted by a company he later found to be fictitious named G.I.I. Engineering. In his report, he also included the Russo report and the report from James Pryor the electrical expert. Fire Marshal Santangelo interviewed the firefighters that responded to the scene as well as witnesses who were at the petitioner's building, including Abraham Weiser, Victor Schlesinger, and Israel Schwimmer.

Fire Marshal Santangelo also testified that on August 3, 1999, another fire broke out at the building. This fire was also later determined to be intentionally set because it had four distinct and separate points of origin. Based upon all the interviews, reports, photographs, and his investigation, Fire Marshal Santangelo concluded that the 1998 fire was an arson and that it was ignited by the intentional application of an open flame. Fire Marshal Santangelo also concluded that the only persons who had keys to the entire building on that night were Jack and Nat Schlesinger and that the buildings were secure upon arrival of the fire department.

### 3. Testimony of Abraham Weiser

Abraham Weiser was called as a witness by the government. He had worked for the petitioner for approximately twelve years until the clothing business closed in 2000. At the time of the fire, Abraham Weiser was the supervisor of the shipping department located on the third floor. He was responsible for packing the manufactured garments in boxes to ship by UPS or in bags to be delivered by their own truck. Weiser testified that no other employees worked with him in the shipping area in December 1998. One of his responsibilities was to secure the two

entrances to the third-floor shipping area and turn off the lights by closing the circuit breaker each night before he left. In fact, Abraham Weiser testified that it was his practice to secure both doors and turn off the circuit breaker at the end of the day and that the only other people with keys to that floor were Jack and Nat Schlesinger. However, Abraham Weiser stated that he did not have keys to the exterior entrances of the factory.

Weiser testified that on December 31, 1998, he was the only person on the third floor during the day. He testified that he did not smoke; that smoking was not permitted in the building; and he did not observe anyone smoking on the third floor on the day of the fire. Weiser stated that he "wouldn't let them smoke" because he "can't take the smoke." (Tr. at 616.) Weiser further testified that there were no flammable liquids, thinners, dyes, linseed oils or the smell of smoke or any other unusual odor before he left on December 31, 1998. Weiser stated that occasionally a small cleaning gun was used on the third floor to remove stains from the finished garments. Weiser testified that on December 31, 1998, at about 4:00 p.m., he locked up the third floor and turned off the circuit breaker providing electricity to the third floor, locked both doors, and left the building.

**B.  Affidavits in Support of Schlesinger's Petition**

**1. Abraham Weiser**

Abraham Weiser was one of the petitioner's employees, who, as previously stated, at the time of the fire was the supervisor of the shipping department located on the third floor.  Weiser was initially called as a witness for the government, and was subsequently recalled as a witness for the defense.  According to Weiser, he was never contacted by trial counsel before he testified for the government, and trial counsel only met with him "for a very short time in a small room outside of the courtroom" immediately before he testified again.  (Wesier Aff., ¶ 11.)  In his

affidavit, Weiser includes information that the petitioner contends his trial counsel should have elicited from Weiser, namely that the third floor area where the fire occurred contained: (1) flammable material such as "a great deal of lint"; "fabric, including cotton"; and plastic bags; (2) an electric hot pot used for boiling water and an electric hot plate used for warming food; (3) an electric cleaning gun; and (4) a gas heater. (Weiser Aff., ¶¶ 5–7.)

### 2. Louis Pfeifer

Louis Pfeifer was a mechanic and maintenance supervisor at the factory for an unspecified time period prior to 1997. Pfeifer testified at the trial for the government, and was never contacted by trial counsel. In his affidavit, Pfeifer states that, had he been interviewed by trial counsel, he would have told them that he had observed a number of accidental fires at the factory that occurred when "cotton dust or lint settled in either the gas heaters, or the steam heaters . . ." (Pfeifer Aff., ¶ 3.)

### 3. Nat Schlesinger

In his own affidavit, Schlesinger states that both before and during the trial, he provided trial counsel "with the names of individuals who were familiar with [the factory's history fires], and who could have testified about possible causes of the December 1998 fire and other fires at the building". (Schlesinger Aff., ¶ 9.)

### 4. John J. Lentini

John J. Lentini is the president and principal investigator of Scientific Fire Analysis, LLC. Lentini's main critique of the government's experts is that their determination that the December 31, 1998 fire was incendiary "was based on a discredited fire investigation methodology known as negative corpus." (Lentini Aff., ¶ 6.) According to Lentini, the use of negative corpus in this situation was in violation of the methodology set forth in NFPA 921.

Lentini explains that negative corpus is dissimilar to the process of elimination methodology in NFPA 921 because NFPA 921 sets forth guidelines for when a fire investigator can use the process of elimination analysis.  He explicitly states that the use of process of elimination is only appropriate where the origin of the fire is clearly defined.  According to Lentini, the December 31, 1998 fire was "not one of those fires" where process of elimination can be used to determine the cause of the fire because "[w]hen the fire goes to a second alarm, and portions of the building collapse, the origin is, by definition, not clearly defined."  (Id., ¶ 7.)  As a result, Lentini contends that a conclusion that the December 31, 1998 fire was incendiary could not be reached under the process of elimination methodology.

In addition, Lentini criticizes other aspects of the methodology employed by the government's experts in determining that the fire was incendiary.  Lentini stated that Russo's analysis was flawed because:  (1) he did not know what debris had been removed prior to his investigation and therefore could not rule out all potential ignition sources; (2) Russo did not examine the kinds of chemicals used in the factory for the purpose of finishing goods; (3) Russo and Pryor did not examine the electric hot plate or electric cleaning gun referenced in the Weiser Affidavit; (4) Russo did not consider the possibility that the fire was caused by the ignition of ubiquitous lint interacting with a transient heat source; and (5) Russo and Santangelo did not consider the numerous lint fires in the factory that were mentioned in the Pfeifer Affidavit.  Lentini also noted that there were additional indicators that the fire was not incendiary, including the facts that:  the alarm was not disabled; the sprinklers were functioning; there were not multiple origins of ignition; and there was no evidence of accelerant.  Lentini did not conclude, however, that the fire was not incendiary, or that an expert would have testified as such.  Rather, Lentini concludes that:

> The determination of an incendiary cause for this fire should have been much more strongly challenged than it was, and defense counsel should have obtained the services of an expert to advise him about the weaknesses in the government's case. Had counsel done so, the defendant would have had a reasonable opportunity to disprove the *corpus delicti.*

(Id., ¶ 16)

### 5. Dennis Smith

Dennis W. Smith is the Senior Fire Expert with Kodiak Enterprises, Inc. His affidavit primarily focused on why Russo's investigation did not comply with NFPA 921. In particular, Smith states that NFPA 921 only allows the use of the process of elimination methodology when the origin of the fire is "clearly defined". According to Smith, Russo's use of a process of elimination methodology was improper where he located the area of origin as opposed to the point of origin—a criticism that at least one court has found does not indicate a failure to comply with NFPA 921, see Royal Ins. Co. of America v. Joseph Daniel Const., Inc., 208 F. Supp. 2d 423, 427, 427 n.3 (S.D.N.Y. 2002) (holding that the fact that the arson expert claimed to rely on the NFPA but reached a conclusion after determining the "area of origin" rather than the "point of origin" did not warrant precluding his testimony). Also, Smith stated that Russo's methodology for determining the area of origin was flawed. According to Smith "[t]he misidentification of the origin is an irreversible error that will always lead to any incendiary finding using the [negative corpus methodology] because the investigator can make the incendiary finding in the absence of an ignition source". (Id., ¶ 51.)

Specifically, Smith argues that Russo's reliance on the area with the greatest damage to determine the area of origin was unreliable because "[a]ssuming the area of greatest damage is the origin for a fire is unreliable in fire conditions that involve fires of long duration" and is a subjective assessment that Russo should have tested. (Id., ¶¶ 43–46.) Because the area of origin

was unknown, Smith states that "every potential ignition source in the compartment or fire area should have been given consideration and examined as a potential ignition source". (Id., ¶ 50.) As a result, Smith asserts that because "none of the elements of a fire cause have been identified . . . the fire cause can only be classified as 'undetermined.'" (Id., ¶ 53.) As Smith explains "[t]he undetermined classification is appropriate whenever the cause cannot be proven to an acceptable level of certainty". (Id.) Based on his analysis, Smith concludes:

> The determination of an incendiary fire based upon the unsupported and speculative beliefs proposed by the governments' investigators, who had relied [on] the Negative Corpus Methodology, could have been more vigorously challenged by an opposing expert. Had an opposing expert been retained with knowledge of fire investigative methodology and the acceptable standards for fire investigation, that expert would have been able to demonstrate and explain the unsound nature and fallacies of [negative corpus methodology] to the jury.

(Id., ¶ 65.)

### 6. David Smith

David M. Smith is the president and principal investigator of Associated Fire Consultants, Inc. Smith's affidavit primarily criticizes the methodology employed by Russo and Pryor in concluding that the December 31, 1998 fire was incendiary. First, Smith addresses how the electric hot plate, an electric hot pot, and a electric cleaning gun are each "known to be a competent ignition source for light combustibles (paper), clothing, "plastic" and lint" and concludes that these items "[could not] be eliminated as 'starting' the fire without examination". (David Smith Aff., ¶ 6.) Thus, because neither Russo nor Pryor examined these items, Smith concludes that their methodology was flawed. Smith also questioned Russo's conclusion that the garments and plastics were ignitable by open flame.

In addition, Smith criticized Russo's elimination of the gas fire suspended heaters as an ignition source on the grounds that visual observation is an inadequate method of investigation and because "the ignition of ubiquitous lint" would not necessarily have resulted in any flame impingement on the heater.  (Id.)  Based on his analysis, Smith determined that "[e]ach of the building blocks used by Mr. Russo in determining the cause of this fire were inadequate and fall fellow the standard of care of professional fire investigation in 1999".  (Id.)  With respect to Pryor's investigation, Smith stated that his results were flawed because he failed to examine the electrical portion of the suspended heaters.  Ultimately, Smith concluded that, "A professional fire investigator would easily have been able to provide valuable assistance to defense counsel during the pre-trial and trial phases of this matter." (Id., ¶ 9.)

## II.  DISCUSSION

### A.  Legal Standard

Under the well-established Strickland standard, a claim of ineffective assistance of counsel requires a showing that: (1) counsel's performance fell below an objectively reasonable standard of performance; and (2) the deficient performance prejudiced the outcome of the proceeding.  Bierenbaum v. Graham, 607 F.3d 36, 50 (2d Cir. 2010) (citing Strickland v. Washington, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984)). To meet the first prong, Schlesinger must demonstrate "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment."  Strickland, 466 U.S. at 687.

In evaluating the first prong of this test, the Court must "'indulge in a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance,' bearing in mind that '[t]here are countless ways to provide effective assistance in any given case' and

that '[e]ven the best criminal defense attorneys would not defend a particular client in the same way.'" United States v. Aguirre, 912 F.2d 555, 560 (2d Cir. 1990) (quoting Strickland, 466 U.S. at 689, 104 S. Ct. 2052)) (alterations in original).

To satisfy the second prong, Schlesinger "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694. In this context, "[a] reasonable probability is a probability sufficient to undermine confidence in the outcome." Id.; see also Lindstadt v. Keane, 239 F.3d 191, 204 (2d Cir. 2001) ("The level of prejudice the defendant need demonstrate lies between prejudice that 'had some conceivable effect' and prejudice that 'more likely than not altered the outcome in the case.'") (quoting Strickland, 466 U.S. at 693). In evaluating prejudice, a court should look to "cumulative effect of all of counsel's unprofessional errors". Gersten v. Senkowski, 426 F.3d 588, 611 (2d Cir. 2005).

Ultimately, "[t]he court's central concern is not with 'grading counsel's performance' but with discerning 'whether despite the strong presumption of reliability, the result of the particular proceeding is unreliable because of a breakdown in the adversarial process that our system counts on to produce just results.'" Aguirre, 912 F.2d at 560 (2d Cir. 1990) (quoting Strickland, 466 U.S. at 696–97, 104 S. Ct. 2052).

Although the test for ineffective assistance of counsel contains two prongs, the Supreme Court specifically noted that federal district courts need not address both components if a petitioner fails to establish either one. Strickland, 466 U.S. at 697, 104 S. Ct. 2052. In particular, "a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies." Id.

15

**B.  Whether the Petitioner Was Prejudiced by Trial Counsel's Alleged Errors**

As noted above, a Court need not examine a petitioner's claims under both prongs of the Strickland analysis if those claims are plainly deficient under either one.  In this case, the petitioner's claims of ineffective assistance of counsel fail in the absence of demonstrable prejudice.  See Smith v. Robbins, 528 U.S. 259, 286 n. 14, 120 S. Ct. 746, 764 n.14, 145 L. Ed. 2d 756 (2000) ("The performance component need not be addressed first"); Strickland v. Washington, 466 U.S. 668, 697, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984) ("If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed.").  The petitioner alleges that trial counsel were constitutionally ineffective because they failed to:  (1) investigate the arson; (2) challenge the government's experts at a Daubert hearing; and (3) conduct meaningful cross-examination of the government's experts and/or call a defense expert to refute the arson allegations.  The combined effect is that, but for trial counsel's errors in investigating the arson claim and consulting an arson expert, more information would have been presented to the jury, both affirmatively and through cross-examination of the government's experts, to suggest that the December 31, 1998 fire was accidental, rather than intentional.

Before addressing the substance of the petitioner's claims, the Court deems it prudent to address his contention that "any reasonable doubt as to the cause of the fire—that is, as to whether it was intentional, rather than accidental—would have tipped the scale in this very weak case toward acquittal".  (Pet.'s Br. at 13 (emphasis added).)

With respect to the prejudice inquiry, the Second Circuit has cautioned that courts should "keep in mind that 'a verdict or conclusion only weakly supported by the record is more likely to have been affected by [counsel's] errors.'"  Gersten v. Senkowski, 426 F.3d 588, 611 (2d Cir.

2005).  On the other hand, "where there is overwhelming evidence of guilt, even serious errors by counsel will not warrant granting a writ of habeas corpus."  Id.; Lindstadt v. Keane, 239 F.3d 191, 204 (2d Cir. 2001) (same) (citing Scarpa v. DuBois, 38 F.1, 16 (1st Cir. 1994); United States v. Reiter, 897 F.2d 639, 645 (2d Cir. 1990); Wise v. Smith, 735 F.2d 735, 739 (2d Cir. 1984)).    Here, the petitioner argues that his case falls into the first category where the evidence supporting the verdict was relatively weak, citing the following statement by the Court's at trial at the close of the government's case:

> In this case as to count 20, the arson count, this is a close call.  I have checked the cases, and I have found no case with this weak evidence.  And it is weak.

(Tr. 2299: 25–2300:3)

As an initial matter, the petitioner's reliance on this quote is out of context.  Subsequent to making this statement, the Court noted that it was "not talking about whether the fire is incendiary.  That is enough to go to the jury".  (Tr. 2300:6–11.)  Thus, contrary to the petitioner's characterization, the Court did not state that the evidence that the fire was incendiary was weak, which is the evidence being challenged in the instant petition.

Moreover, even with respect to the circumstantial evidence of the petitioner's involvement, the Court reversed its spontaneous statement on the record in the context of addressing the petitioner's motion for acquittal following the judgment, noting that there was ample evidence to support his conviction.  In summarizing the Court's decision on the Rule 29 motion in Schlesinger II, the Court stated:

> Although the Court had initially commented at the trial that the evidence appeared weak, upon further review the Court found that the circumstantial indices of guilt were supported by ample evidence to show that the fire was intentionally set; that the defendant had a motive to set the blaze in order to recover insurance proceeds; and that he had the opportunity to commit the

crime. The Court also noted that the jury had a right to consider the defendant's suspicious behavior after the fire in his interaction with Fire Marshal Santangelo as a display of consciousness of guilt.

Schlesinger II, 438 F. Supp. 2d 76, 89 (E.D.N.Y. 2006). The Second Circuit affirmed this Court's finding that the evidence supported the arson conviction. See United States v. Schlesinger, 261 F. App'x 355, 359 (2d Cir. 2008). Thus, contrary to the petitioner's contention, the Court does not analyze the purported prejudice caused by trial counsel's alleged errors under the lower standard applicable to weak cases. With that in mind, the Court addresses separately below each of the three purported errors by trial counsel in challenging the government's arson case.

### 1. Failure to Investigate

The petitioner claims that trial counsel was ineffective because they failed to investigate non-arson causes of the fire. In support of this contention, the petitioner submits the affidavits of Abraham Weiser, Louis Pfeifer and his own affidavit.

As an initial matter, the petitioner's affidavit is too vague to support his claim of ineffective assistance. Merely stating that there were "individuals" who could identify "possible causes" of the December 1998 fire constitutes the type of "[s]elf-serving conclusory allegations . . . [that] are insufficient to establish ineffective assistance of counsel". Blumenberg v. United States, No. 05-CV-9416, 2009 WL 3459185, at *3 (S.D.N.Y. Oct. 27, 2009) (citing United States v. Torres, 129 F.3d 710, 715–17 (2d Cir. 1997)).

With respect to the information contained in the Pfeifer Affidavit, the Court finds that there is no reasonable probability that testimony about previous lint fires would alter the jury's verdict that the *December 31, 1998 fire* was incendiary. The accumulation of lint and the existence of steam and gas heaters on the third floor were raised at trial, and trial counsel cross-

examined Russo on the possibility that the accumulation of lint in conjunction with either type of heater ignited the fire. Furthermore, the value of this information is further marginalized by the fact that the jury heard testimony about four other fires at the factory that were not ruled as incendiary.

Finally, of the information contained in the Weiser Affidavit, the only new information that was not presented for consideration to the government's experts is the presence of an electric hot pot, and electric hot plate, and to some extent the electric cleaning gun containing solvent on the third floor. Although Weiser disclosed the existence of the electric cleaning gun to trial counsel during cross-examination, there is no indication he mentioned it to Russo during his interview, and Russo was not questioned about it at trial.

The petitioner exaggerates the importance of the electric hot pot, electric hot plate, and the electric cleaning gun with solvent. Weiser, who testified that he was the only person on the third floor during the day on the day of the fire, does not state whether the electric hot pot or electric hot plate were on when he left, or whether the electric cleaning gun was near any combustible materials. Although Weiser states that he would have told trial counsel about these items if he had been asked, he provides no explanation as to why he did not inform Russo, the fire investigator, about the electric hot pot or electric hot plate when he was questioned about the existence of transient heat sources on the third floor. More important however, is the fact that neither party disputes that these items were not present on the third floor during Russo's investigation on January 7, 1999, and therefore, assuming they were ever there, must have been removed with the debris. (See David Smith Aff. ¶ 6 ("Mr. Russo admitted that he was unaware of what debris had been in place and removed in the seven days prior to his arrival. That debris

apparently contained three competent ignition sources, an electric hot pot, electric hotplate and electric cleaning gun containing solvent.").)

In his expert affidavit, David Smith addresses how the electric hot plate, an electric hot pot and the electric cleaning gun are each "known to be a competent ignition source for light combustibles (paper), clothing, "plastic" and lint" and concludes that these items "[could not] be eliminated as 'starting' the fire without examination". (David Smith Aff., ¶ 6.) Lentini also faults Russo and Pryor for failing to investigate the electric hot pot, electric hot plate, and electric cleaning gun containing a solvent. (Lentini Aff., ¶ 11.) However, given that these items were removed with the debris, Russo could not have performed an independent examination of them as a possible ignition source. Neither for that matter, can David Smith or Lentini perform an examination of these items. Thus, whether these devices were the "smoking gun" is complete conjecture and surmise. There would have been no way to confirm at the time that these items were present on the third floor on the day of the fire; that the electric hot pot or electric hot plate were left on; or that any of the items were close enough to combustible material to result in a fire. As Lentini states in his affidavit, "One cannot examine and eliminate that which one cannot see". (Id., ¶ 9.) At most, the jury would have been told that there was a possible transient heat source that potentially could have caused the fire that was swept away in the debris. Thus, the impact of this testimony is somewhat marginal.

Moreover, the impact of trial counsel's failure to uncover and question the government's experts about these devices is lessened even further by the fact that trial counsel presented to the jury the theory that a transient heat source, in the form of a cigarette, may have been swept away in the debris:

> Q    Now, we are talking about fuel source, but in looking at
> the chart, you can't tell us the ignition source?

A    In terms of what was there in terms of my investigation, the only logical conclusion would be open flame.

Q    And you reached that conclusion because, as you testified on direct examination, you had excluded what you believed to be all other accidental possibilities?

A    That is correct.

Q    But you will agree that there was a lapse of approximately one week between the time that the fire happened and the time you first conducted your inspection?

A    That is correct, sir.

Q    And you will also agree that there was a lot of debris in the factory that you did not examine?

A    I don't know if it was a lot. But there was certainly debris that was there following the extinguishment that I possibly didn't see.

Q    But it only takes one piece of debris that you didn't see that would change your hypothesis, isn't that true, Mr. Russo?

A    No, it would not.

Q    Mr. Russo, are you telling us that if you had gone through the debris and found a discarded cigarette, that that would have not changed your hypothesis as to the cause of the fire?

A    No.

Q    You are telling us if you had found evidence of lint that had accumulated near the gas fired heater, that that wouldn't have changed your hypothesis as to the cause of the fire?

A    No.

Q    And that you would have conducted no other tests in order to rule out the discarded cigarette that you found as a possible cause of the fire?

A    That is correct.

(Tr. 745:5–746:15.)  Thus, while the information about additional potential ignition sources may have had some effect on the jury, the Court finds that there is no reasonable probability that testimony about additional, unverifiable, potential ignition sources would have undermined the jury's verdict.  Accordingly, the Court finds that any error by trial counsel in failing to investigate and uncover the information in the Weiser and Pfeifer Affidavits did not prejudice the petitioner.

## 2. Failure to Challenge the Arson Experts at a <u>Daubert</u> Hearing

The petitioner argues that his counsel was ineffective for failing to raise a <u>Daubert</u> challenge to the admissibility of Russo and Santangelo's testimony because they relied on the negative corpus methodology, which is not endorsed by NFPA 921. In addition, the petitioner contends that trial counsel should have moved to exclude Santangelo's causation testimony because it relied on Russo's report.

As petitioner's expert Dennis Smith highlights, the negative corpus methodology is distinct from the process of elimination methodology in NFPA 921. Both Lentini and Dennis Smith state in their affidavits that NFPA 921 would not permit the use of process of elimination to determine whether the December 31, 1998 fire was incendiary because the origin of the fire was not "clearly defined". Although the parties disagree on whether Russo and Santangelo's methodology was actually consistent with NFPA 921, it is beyond dispute that neither Russo nor Santangelo purported to rely on NFPA 921 in concluding the fire was incendiary. Assuming a reasonable lawyer would have challenged the admissibility of their testimony on these grounds, it is only prejudicial if there is a reasonably probability that the Court would have granted the motions. As set forth below, because the Court finds that there is no reasonable probability it would have granted either motion, the Court finds that trial counsel's failure to challenge admissibility of Russo and Santangelo's testimony was not constitutionally ineffective.

Federal Rule of Evidence 702 ("Rule 702") provides that:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702.  As articulated by the Supreme Court in <u>Daubert v. Merrell Dow</u>

<u>Pharmaceuticals, Inc.</u>, 509 U.S. 579, 589, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993), Rule 702

"clearly contemplates some degree of regulation of the subjects and theories about which an

expert may testify" and "assign[s] to the trial judge the task of ensuring that an expert's

testimony both rests on a reliable foundation and is relevant to the task at hand."  As the

Supreme Court further explained in <u>Kumho Tire Co., Ltd. v. Carmichael</u>, 526 U.S. 137, 152, 119

S. Ct. 1167, 143 L. Ed. 2d 238 (1999), Rule 702 requires that a court fulfill this "gatekeeping"

function by "mak[ing] certain that an expert, whether basing testimony upon professional studies

or personal experience, employs in the courtroom the same level of intellectual rigor that

characterizes the practice of an expert in the relevant field."

To determine whether expert testimony is admissible, the court must consider whether:

(1) the witness is qualified as an expert to testify as to a particular matter; (2) the witness has

based his opinion upon reliable data and methodology; (3) the expert's testimony on the

particular subject is relevant because it will assist the trier of fact; and (4) pursuant to Rule 403

the testimony's "probative value is substantially outweighed by the danger of unfair prejudice,

confusion of the issues, or misleading the jury."  <u>Nimely v. City of New York</u>, 414 F.3d 381, 397

(2d Cir. 2005) (quoting Fed. R. Evid. 403).  Here, the petitioner mainly disputes the second

consideration, namely, whether Russo and Santangelo based their opinions on a reliable

methodology.

When dealing with challenges to the reliability of scientific evidence, the court must

focus on the methodology that the experts used to draw a conclusion and not on the conclusion

itself.  <u>See</u> <u>Daubert</u>, 509 U.S. at 590, 595, 113 S. Ct. 2786.  However, as the Supreme Court

noted in <u>Kumho</u>, "the law grants a district court the same broad latitude when it decides how to

determine reliability as it enjoys in respect to its ultimate reliability determination." Kumho Tire Co., 526 U.S. at 151, 153, 119 S. Ct. 1167 (emphasis in original); Amorgianos v. Nat'l R.R. Passenger Corp., 303 F.3d 256, 265 (2d Cir. 2002) ("[I]n analyzing the admissibility of expert evidence, the district court has broad discretion in determining what method is appropriate for evaluating reliability under the circumstances of each case.").

Nevertheless, "when an expert opinion is based on data, a methodology, or studies that are simply inadequate to support the conclusions reached, Daubert and Rule 702 mandate the exclusion of that unreliable opinion testimony." Id. at 266. On the other hand, "[w]here an expert otherwise reliably utilizes scientific methods to reach a conclusion, lack of textual support may "go to the weight, not the admissibility" of the expert's testimony." Amorgianos, 303 F.3d at 267 (citing McCullock v. H.B. Fuller Co., 61 F.3d 1038, 1044 (2d Cir. 1995)). "A minor flaw in an expert's reasoning or a slight modification of an otherwise reliable method will not render an expert's opinion per se inadmissible." Id. at 267.

Ultimately, when determining whether a proffered expert's testimony is reliable, the court "must focus on the principles and methodology employed by the expert, without regard to the conclusions the expert has reached or the district court's belief as to the correctness of those conclusions." Id. at 266. Rule 702 codifies a liberal admissibility standard and "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." Daubert, 509 U.S. at 596, 113 S. Ct. 2786.

As an initial matter, the Court need not determine whether Russo and Santangelo's methodology complied with NFPA 921, because both experts testified that they did not follow NFPA 921 in reaching their conclusions that the fire was incendiary. However, even assuming

Russo and Santangelo's analysis was inconsistent with NFPA 921, the Court finds that a failure to follow the methodology in NFPA 921 does not automatically require the exclusion of expert testimony on the cause and origin of a fire.

The Court does not dispute that NFPA 921 "is widely accepted as the standard guide in the field of fire investigation".  United States v. Hebshie, 754 F. Supp. 2d 89, 109 n.39 (D. Mass. 2010); Royal Ins. Co. of Am. v. Joseph Daniel Constr., Inc., 208 F. Supp. 2d 423, 426–27 (S.D.N.Y. 2002) (recognizing the NFPA 921 as a generally accepted standard in fire investigations).  Nor is the Court unaware that courts frequently exclude expert testimony for failure to comply with NFPA 921 in circumstances where the expert explicitly relies on NFPA 921 in reaching his or her conclusion.  See, e.g., Presley v. Lakewood Engineering and Mfg. Co., 553 F.3d 638 (8th Cir. 2009); Fireman's Fund Ins. Co. v. Canon U.S.A., Inc., 394 F.3d 1054 (8th Cir. 2005).  However, the Court is aware of no court in this circuit that has refused to admit expert testimony in an arson case because his or her opinion was based on a methodology other than that prescribed in NFPA 921.  Accord McMullen v. Lasko Prods., Inc., No. 08-CV-152, 2010 WL 8057197, at *3 (E.D. Tex. Jan. 14, 2010) ("Lasko has cited no case in this circuit, and the court has found none, which states that the *only* way an expert can investigate a fire is by following NFPA guidelines, or that any deviation from this model means an expert's methodology is irredeemably flawed.) (emphasis in original); cf. Pekarek v. Sunbeam Prods., Inc., 672 F. Supp. 2d 1161, 1175 (D. Kan. 2008) ("[C]ourts have said a failure to strictly adhere to NFPA 921 does not render an investigation per se unreliable.") (citing Am. Family Mutual Ins. Co. v. Hewlett–Packard Co., No. 07-CV-792, 2008 WL 2130217 (D. Minn. May 19, 2008)); Torske v. Bunn-O-Matic Corp., No. A4-03-21, 2004 WL 1717649, at *5 (D.N.D. July 28, 2004) ("It is not readily apparent that a failure to strictly adhere to all NFPA guidelines renders an

investigation incomplete or unreliable. In addition, while these guidelines provide a legitimate criteria for evaluating an investigation, there is nothing before the Court to suggest they are exhaustive or exclusive.").

Moreover, regardless of whether negative corpus is approved by the NFPA, "the absence of an accidental explanation for a fire frequently has been cited as a sufficient basis for a finding of arson." Somnis v. Country Mut. Ins. Co., --- F.Supp.2d ----, 2012 WL 116815, at *4 (D. Minn. Jan. 3, 2012) (collecting cases); see also Hickerson v. Pride Mobility Prods. Corp., 470 F.3d 1252, 1257–58 (8th Cir. 2006) (holding, without any reference to NFPA 921, that "[b]ased on the identification of a point of origin and the elimination of other possible causes, it is permissible for [the cause and origin expert] to testify as to the point of origin and to explain that he inferred through process of elimination that the PowerChair was the cause of the fire").

Here, the Court finds that Russo's methodology was reliable. Russo reached his conclusion that the fire was incendiary based on his years of experience; his physical inspection of the factory and its contents; interviews with Weiser and Jack Schlesinger; and consultation with Pryor, an electrical engineer. As summarized in more detail in the background section of this opinion, Russo ruled out the possibility that the fire was caused by the steam or gas heaters igniting lint or other combustibles; a smoldering cigarette; or an act of god. Regardless of whether it is an NFPA approved method, the Court finds that Russo's methodology was reliable and therefore there is no reasonable probability that the Court would have excluded his testimony under Daubert. See Hickerson, 470 F.3d at 1257 (holding that a cause and origin expert's methodology was reliable where he: (1) "examined burn patterns, examined heat, fire, and smoke damage, considered this evidence in light of testimony regarding the fire, and identified a point of origin"; (2) "then considered as possible causes of the fire those devices that contained

or were connected to a power source and that were located at the identified point of origin"; and (3) "eliminated as possible sources those devices that were not in the area of origin or that were not connected to a power source and contained no internal power source").

The decision not to follow the methodology set forth in NFPA 921, as well as other purported flaws in the Russo methodology—*e.g.*, the failure to rule out other possible causes—goes to the weight of the evidence, not its admissibility. See Allstate Ins. Co. v. Gonyo, No. 07-CV-1011, 2009 WL 1212481, at *6 (N.D.N.Y. April 30, 2009) (denying Daubert challenge to an arson expert who did not "ardently and strictly followed each step of NFPA" and holding that "[i]f there is any question that [the arson expert] did not eliminate every cause for the fire, this will not be determinative as to whether he will testify; all that it suggests is that the credibility of his decision may be subject to an attack."); Pekarek, 672 F. Supp. 2d at 1175–76 (the mere fact that the expert did not "cite or use NFPA 921 as his guide does not necessarily mean he failed to use a reliable method" and although he did not note and document all items that may have been potential causes of the fire "such deficiencies, while grounds for cross-examination, are not sufficient to preclude a jury from hearing and considering his opinion testimony as to the point of origin or his opinion ruling out specific items such as the breaker panel and the candle (although not the attempt to light it) as possible causes of the fire").

Having found that Russo's testimony was admissible, there is also no reasonable probability that the Court would have excluded Santangelo's testimony, which was based in part on Russo's report. The petitioner faults Santangelo for not conducting his own tests and relying on Russo's report. However, this is not a valid basis for excluding his testimony because experts are permitted to rely on the reports of others, and there is no requirement that an expert conduct his own tests. Fed. R. Evid. 703 ("An expert may base an opinion on facts or data in the case

that the expert has been made aware of or personally observed. . . . "); <u>Gussack Realty Co. v.</u>
<u>Xerox Corp.</u>, 224 F.3d 85, 94–95 (2d Cir. 2000) ("[A]n expert may rely on data that she did not
personally collect. . . . The expert need not have conducted her own tests."); <u>see also</u> <u>Peerless</u>
<u>Ins. Co. v. Marley Engineered Prods. LLC</u>, No. 05-CV-4848, 2008 WL 7440158, at *6
(E.D.N.Y. June 12, 2008) ("Galler and Eagar were entitled to rely on LeBow 's findings with
respect to cause and origin. Experts in fire cases often rely upon the observations of other experts
in reaching their conclusions."); <u>cf.</u> <u>Kozar v. Sharp Electronics Corp.</u>, No. 04-CV-901, 2005 WL
2456227, at *3 (W.D. Pa. Sept. 30, 2005) (excluding the testimony of a cause and origin expert
who based his opinion on the testimony of an expert whose opinion was excluded for failure to
follow a reliable methodology).

Here, Santangelo not only based his conclusion that the fire was incendiary on Russo's
report, but also on Pryor's report; his interviews with the firefighters who responded to the scene;
his interview with the petitioner; and his investigation into the fraudulent insurance claims
submitted after the fire. Trial counsel had the opportunity to cross-examine Russo, and did
cross-examine him, on the methodology he employed. They also cross-examined Santangelo
with regard to his reliance on Russo's report. Whether trial counsel's failure to consult an expert
to assist in the cross-examination of Russo and Santangelo was prejudicial is addressed below.

Thus, while the jury would have had experts, rather than trial counsel, question the
application of the negative corpus methodology, or the implications of not following NFPA 921,
there is no reasonable probability that the Court would have excluded the opinions of Russo and
Santangelo that the fire was incendiary based on the use of negative corpus. As a result, the
petitioner was not prejudiced by trial counsel's failure to raise a <u>Daubert</u> challenge to the
admissibility of Russo and Santangelo's testimony.

### 3. Failure to Consult with an Arson Expert or Call A Defense Expert

The petitioner's final and main argument is that he was prejudiced by trial counsel's failure to consult an arson expert or call an expert witness to refute Russo and Santangelo's conclusions that the fire was incendiary based on the use of the negative corpus methodology. In order to frame the Court's discussion of prejudice under the facts and circumstances of this case, the Court provides a brief summary of three arson cases relied upon by the petitioner, United States v. Hebshie, 754 F. Supp. 2d 89 (D. Mass 2010), Dugas v. Coplan, 428 F.3d 317 (1st Cir. 2005), and Richey v. Bradshaw, 498 F.3d 344 (6th Cir. 2007), where the courts held that defense counsel was constitutionally ineffective in failing to consult an expert or call an expert witness to refute the government's causation evidence.

In United States v. Hebshie, 754 F. Supp. 2d 89 (D. Mass 2010), the petitioner was convicted of arson and mail fraud for a fire in a commercial building where the petitioner had a convenience store. To show arson, the prosecution presented evidence from: (1) a cause and origin expert that the fire had originated in the petitioner's store, as well a rebuttal expert that testified that he did not see any evidence that the fire started in the basement of the building; (2) an "accelerant-detection dog", that had allegedly detected the presence of an accelerant on the carpet in the petitioner's store; and (3) a laboratory test of a carpet sample from the petitioner's store that a laboratory technician testified contained "light petroleum distillate". 754 F. Supp. 2d at 92. To show that the petitioner perpetrated the arson, "the government demonstrated that Hebshie leased space in the building for his convenience store, that he owed roughly $5,000 to lottery authorities, that he was trying to sell the store, and that he sought to recover on an insurance policy." Id.

At a hearing on the habeas petition, the petitioner presented evidence calling into question the conclusion that the fire originated in the store as opposed to the basement, and challenging the accuracy of the canine evidence and laboratory results regarding the presence of an accelerant.  The court found that trial counsel's performance fell below <u>Strickland</u> standards because, among other reasons they:  (1) failed to move for a <u>Daubert</u> hearing prior to trial on any expert issue; (2) "did not seek exclusion of any of the proposed expert testimony which was the core of the arson case, or move for its limitation"; and (3) "did not argue that the expert testimony failed to meet the minimal threshold for reliability of scientific evidence in NFPA 921 and should not have been admitted at all".  <u>Id.</u> at 112.

With respect to the prejudice prong, the court concluded that it would have excluded the laboratory analysis on the carpet sample and would have severely limited the canine evidence. Although the court stated that whether it would have excluded the testimony of the cause and origin expert was a "closer question", it ultimately did not resolve the issue because it was unnecessary in light of its finding with respect to the canine and laboratory evidence.  <u>Id.</u> at 124–25.  The court further found that the trial counsel's uninformed cross-examination could not avoid a finding of prejudice because the motive evidence was so weak, that without the accelerant laboratory analysis or the canine evidence "[t]here would have been no case at all." <u>Id.</u> at 127.  In particular, the court cited to the weak motive testimony, which the court noted earlier in the opinion was "less than overwhelming", <u>id.</u> at 92, as well as the fact that Hebshie set the alarm with his personal passcode, and that the fire was set during a busy time of day, which seemed "very risky for a relatively small award".  <u>Id.</u> at 127.  The court summarized the prejudice caused by trial counsel's errors as follows:

> The prejudice is clear: Without [the canine's] "testimony" or the
> laboratory analysis, there is a more than "reasonable probability"

that the outcome of the trial would have been different. While the cause-and-origin testimony purports to identify where the fire began, the canine evidence and the laboratory results are essential to prove that the fire was an arson, not an accident. Without it, there is simply no crime.

Id. at 95.

In Dugas v. Coplan ("Dugas I"), 428 F.3d 317 (1st Cir. 2005), the petitioner was convicted of arson for a fire at a grocery store of which he was a part-owner and manager. To show that the fire was incendiary, the state relied on the negative corpus testimony of the fire investigators as to the cause and origin of the fire, as well as the expert testimony of a forensic chemist who determined that "some, though not all, of the samples [taken from the store] contained ignitable liquids: medium petroleum distillates in some, and normal alkanes in others", which can be used as fire accelerants. 428 F.3d at 320–21. The remainder of the state's case consisted of "a videotape that showed Dugas leaving the store and then returning a few minutes later; motive evidence regarding recent troubles in Dugas's life; and testimony of the wife of . . . the man who Dugas argued was the real perpetrator of the crime". Id. at 323. In his habeas petition, Dugas argued that his trial counsel was ineffective because he failed to consult an arson expert or pursue a non-arson defense. The court held that trial counsel's performance fell below the Strickland standard because a non-arson defense was critical to refuting the state's case in light of the weak circumstantial evidence and the difficulties of pursuing an identification defense. The court also noted that trial counsel admitted that he lacked any knowledge of arson investigation and conceded that he had reason to believe there were problems with the state's arson case. Id. at 329–31.

With respect to the prejudice prong, the court noted petitioner presented an expert report challenging, among other things: (1) the chemical analysis showing the presence of accelerants based on the methodology used to reach the conclusion and (2) the determination of where and

when the fire started based on a failure of the fire investigators to account for ventilation and

smoke shadows.  Id. at 334–35.  The First Circuit noted that whether Dugas was prejudiced by

trial counsel's errors presented a "knottier question", but that the possible flaws in the chemical

analysis gave them "considerable pause".  Id. at 334.  With respect to the use of negative corpus

in the cause and origin analysis, the court noted that had trial counsel consulted with an expert

and learned of the potential flaws in the cause and origin conclusion based on the ventilation and

smoke shadows "his cross-examination of the fire investigators could have been far more

pointed".  Id. at 340.  Notably, the Court's finding of prejudice was based in large part on the

fact that the "state presented a thin circumstantial case".  Id. at 342.  In particular, the court

noted:

> The state's evidence of motive was a potpourri of generalities
> about the stresses of marriage and business, without any theory of
> how burning the store could possibly benefit Dugas, financially or
> otherwise. Despite the deficiencies in the defense, it took the jury
> three days of deliberations to reach a guilty verdict after only eight
> days of trial. The length of jury deliberations can be one factor in
> determining how close the jury viewed the case to be. In a close
> case, the failure of defense counsel to present certain evidence or
> effectively challenge the state's evidence on important issues can
> be particularly prejudicial.

Id. at 335–36.  However, even with this evidence, the court was unable to determine as a matter

of law that counsel's errors prejudiced the petitioner.  Because the lower court had found that

trial counsel's performance was reasonable, it had not reached the prejudice prong.  Thus, the

court remanded the case to determine whether the testimony of the proposed arson expert or the

use of his advice on cross-examination could have affected the outcome of the trial.  Id. at 342.

On remand, the state court found that Dugas failed to meet the prejudice standard, stating

that it "[did] not share the appellate court's negative evaluation of the state's case" and holding

that "Dugas's theories as to the prejudice resulting from his counsel's failure to consult with an

arson expert do not undermine the court's confidence in the guilty verdict." Dugas v. Warden

("Dugas II"), No. 03-cv-376-JD, 2006 WL 2463670, at *15 (D.N.H. Aug. 24, 2006).  This

decision was affirmed by the First Circuit.  See Dugas v. Coplan ("Dugas III"), 506 F.3d 1 (1st

Cir. 2007).

In Richey v. Bradshaw, 498 F.3d 344 (6th Cir. 2007), the petitioner was convicted of

arson for setting fire to an apartment below the one occupied by his ex-lover, which resulted in

the death of a two-year old child.  There was a substantial amount of evidence showing that

Richey set the fire, including the fact that his ex-lover had recently told Richey that she was

leaving him for another man; Richey stated that the apartment complex would "burn" and made

threats that night that he would "torch the place"; and numerous witnesses placed him in the

burned apartment building at the time of the fire.  Id. at 346–47.

As to the direct evidence of arson, the state's experts did not rely on negative corpus to

reach their conclusion of arson, but rather, based on the speed and intensity of the fire, burn

patterns, and laboratory tests used to identify the presence of accelerants, the experts testified

that the fire was definitively caused by an accelerant being poured into the living room of the

house.  At trial, Richey's counsel chose not to mount a non-arson defense, but rather to focus on

an identification defense.  In his habeas petition, Richey argued that his counsel was ineffective

in failing to investigate or consult an arson expert, and more specifically, in failing to mount a

non-arson defense.   The court held that the performance of Richey's trial counsel fell below the

Strickland standard because he "did not conduct the investigation that a reasonably competent

lawyer would have conducted into an available defense—that the fire was not caused by arson—

before deciding not to mount that defense."  Id. at 362.

With respect to the prejudice prong, the court held that the failure to consult and call arson experts to mount a defense of non-arson was prejudicial not only because the experts would have refuted the scientific method, but because they would have refuted specific scientific findings and "testified that the most likely cause of the fire was a cigarette smoldering in the cushions of Collins's couch." Id. at 364. Ultimately, in finding that the petitioner was prejudiced by trial counsel's errors, the court held:

> Although the circumstantial evidence alone might have led to a conviction, the question before us is not one of the sufficiency of the evidence, but of undermining our confidence in the reliability of the result. In addition, witnesses are not always believed. Confronted with evidence debunking the State's scientific conclusions, the trial court might have had a reasonable doubt about Richey's guilt, especially where the prosecution's case depended on a cast of witnesses whose lives revolved around drinking and partying and some of whom might have had their own motives for implicating Richey.

Id.

All three of these cases are distinguishable from the instant case in several important respects. First, in Richey, Hebshie, and Dugas the prosecution's experts did not solely rely on negative corpus to reach their conclusions that the fire was incendiary, but rather on direct evidence of arson based on direct forensic evidence proving the existence of accelerants. In this Court's view, in that situation, there is a higher probability of prejudice resulting from a failure to present expert testimony or consult an expert to refute forensic evidence of arson. Indeed, in Dugas, where the petitioner argued that an arson expert would have refuted both the negative corpus analysis and the forensic evidence showing the existence of an accelerant, the First Circuit stated with regard to the "knottier question" of prejudice that it was the "flaws in the state forensic chemist's analysis" that "gave [them] considerable pause". Dugas I, 428 F.3d at 334.

Furthermore, unlike in <u>Dugas I</u>, where the court found that the petitioner was prejudiced in part due to his trial counsel's ineffective cross-examination of the state's arson experts, the majority of the purported flaws in the methodology of the government experts were addressed by trial counsel in this case. The petitioner does not dispute that on cross-examination, trial counsel: elicited testimony challenging the conclusion that the fire was set intentionally; questioned Russo and Santangelo's methodology; and criticized their failure to adhere to NFPA 921. Instead, the petitioner argues that he was prejudiced because "[w]hile those questions might have supplied a portion of the predicate for an expert's conclusion that the 1998 fire could not be categorized as 'intentional,' counsel never conveyed the critical conclusion to the jury, either through cross-examination or by means of a defense witness". (Reply Br. at 6.)

For example, while the petitioner acknowledges that trial counsel questioned the government's experts about their failure to adhere to NFPA 921, he argues that, rather than call an expert witness to refute Russo and Santangelo's "nonchalant dismissal of NFPA 921", trial counsel "allowed the government witnesses' disparagement of NFPA 921 to be the final word on the subject". (Reply Br. at 6.)

With respect to the possibility that the fire was caused by the steam heater or the gas heater, the petitioner's experts dispute Russo's methodology in ruling them out. Lentini criticizes Russo for "apparently . . . not consider[ing] the possibility of the ignition of the ubiquitous lint . . . in the clothing factory by a transient heat source such as a natural gas space heater or an electric device". However, trial counsel did cross-examine Russo on this ground.

> Q. "You are telling us if you had found evidence of lint that had accumulated near the gas fired heater, that that would have changed your hypothesis as to the cause of the fire?
> A: No.

> Q: And that you would have conducted no other tests in order to rule out the discarded cigarette that you found as a possible cause of the fire?
> A: That is correct.
> Q. So [,] as you sit here today, you cannot tell us what in fact did cause the fire?
> A. That's correct.

(Tr. 774–775.)

In addition, David Smith states in his affidavit that Russo's elimination of the gas fire suspended heaters as an ignition source was flawed on the grounds that visual observation is an inadequate method of investigation and because "the ignition of ubiquitous lint" would not necessarily have resulted in any flame impingement on the heater. As indicated in the exchange set forth below, trial counsel did examine Russo about the possibility that the suspended heater could have ignited the fire, even absent the existence of flame impingement on the heater itself. As Russo explained, Weiser informed him that the gas-fired heater was not operating and there was no evidence above or below the heaters to suggest they were the cause of the fire.

> Q And if the fire -- if the point of origin for the fire had been that suspended heater, would the burn patterns have been different?
> A There was nothing above or directly below. There would have to be something combustible up at that level adjacent or against the suspended heater. There was mostly steel framing.
> Q Can you tell from the charring or the burn patterns as to whether there was fire from those heaters themselves?
> A There was no fire from those heaters.
> Q During the course of your investigation, you determined as to whether the heaters were operating or not operating at the time of the fire?
> A According to Mr. Weiser, they were steam heaters, which suspend. The steam heaters were operating. The gas-fired ones by the stairs leading to the mezzanine was not.

(Tr. 748:10–749:2.)

While trial counsel may have been less effective at cross-examining the government's experts than they would have been had he consulted with an arson expert, they identified the

relevant areas of weakness and elicited testimony questioning both the methodology and its application underlying the testimony that the fire was incendiary. This is in contrast to Dugas I, where the court noted that "the focus of [trial counsel's] cross-examination of the state's experts was unclear, and many of the experts' scientific conclusions went unchallenged" and that "[trial counsel's] questions amounted to an unfocused set of miscellaneous criticisms and evinced his lack of scientific knowledge". 428 F.3d at 324.

Notably, it was not the deficient cross-examination alone that led to the probability of prejudice in Dugas I, but a totality of the circumstances, including the weak circumstantial evidence. Id. at 341 ("*[I]n a case as close as this*, the likelihood of a more effective cross-examination with the use of an expert, and the effect of such cross-examination on the jurors, generates concerns that may reach 'a probability sufficient to undermine confidence in the outcome.'") (quoting Strickland, 466 U.S. at 694, 104 S. Ct. 2052) (emphasis added). Cross-examining Russo and Santangelo by pointing out other possible accelerants that they could have tested had they been available, and questioning their methodology for ruling out other possible causes, would have called their credibility into question. In the Court's view, such a cross-examination would not have so undermined their testimony that a probability exists that the outcome of the proceeding would have changed.

However, even if the government experts' credibility as to the conclusion that the fire was incendiary had been severely undermined, and a defense expert had testified that the cause of the fire was "undetermined", there is more than a reasonable probability, based on the circumstantial evidence alone, that the jury would have found that the fire was incendiary and that the petitioner set the fire. Cf. United States v. LaPorta, 46 F.3d 152, 162 (2d Cir. 1994) ("Since a jury verdict may rest on circumstantial evidence, the proof that Sicurella had his own

car burned for insurance purposes was more than sufficient.") (citing United States v. Libera, 989 F.2d 596, 601 (2d Cir. 1993); see also United States v. Schlesinger, 261 F. App'x 355, 359 (2d Cir. 2008) (affirming Schlesinger's arson conviction based on circumstantial evidence and quoting United States v. Sureff, 15 F.3d 225, 228 (2d Cir. 1984) for the proposition that "crimes may be proven entirely by circumstantial evidence"); United States v. Fiore, 821 F.2d 127, 128–29 (2d Cir. 1987) (affirming an arson conviction based on circumstantial evidence of the defendant's motive to set the fire, the fact that the defendant "had the sole and exclusive opportunity to set the blaze", and eyewitness testimony that, if credited, placed the defendant near the scene of the crime).

In Hebshie and Dugas, the court's prejudice determinations hinged in large part on weakness of the circumstantial evidence that the petitioners in those cases were the perpetrators of the fire. In Hebshie, the court stated that the evidence was so underwhelming, that without the canine and laboratory evidence "there [was] no case at all". Hebshie, 754 F. Supp. 2d at 127. Relevant to the First Circuit's finding of potential prejudice in Dugas I was the fact "[t]he state's strongest evidence was its expert testimony on arson; the balance of its evidence was relatively weak". 428 F.3d at 323. In particular, the court noted that "[t]he videotape linking Dugas to the scene of the fire was barely viewable and undated" and "the state never presented a theory of how burning the store could possibly benefit Dugas". Id.; see id. at 336. ("This case lay on a knife edge, and it would not have taken much to sway at least some jurors towards acquittal. Accordingly, the threshold for prejudice is comparatively low because less would be needed to unsettle a rational jury."). Indeed, on remand, the lower court in Dugas II found that there was no prejudice in part because it "[did] not share the appellate court's negative evaluation of the

state's case". 2006 WL 2463670, at *15. By contrast, in this case, the circumstantial evidence, both that the fire was incendiary and that the petitioner was the perpetrator, was substantial.

First, even without Russo and Santangelo's testimony, there is circumstantial evidence supporting a finding that the fire was incendiary, namely the time, location, and timeline of events. Unlike the fire is <u>Hebshie</u>, which was set during a busy workday, the fire at the factory was in the evening, on New Year's Eve, when people were less likely to be around. Furthermore, the fire had been confined to the third floor where there was no valuable machinery to damage.

Second, there was testimony that the petitioner had prior knowledge of the contemplated arson. The Court summarized this testimony in <u>Schlesinger I</u> as follows:

> Israel Schwimmer observed the Defendant and his son removing four or five bags of papers from the Defendant's files in the second floor office the day of or day prior to the fire. In addition, Schwimmer testified that the Defendant told Abraham Weiser not to lock the third floor that night. Further, Victor Schlesinger testified that he was instructed by the Defendant not to return to the building that night.

372 F. Supp. 2d 711, 723 (E.D.N.Y. 2005).

Third, unlike in <u>Hebshie</u>, where the purported motive was a $5,000 debt, and <u>Dugas</u>, where no motive was offered at all, there was both unequivocal evidence that the petitioner had a substantial monetary motive in the form of false insurance claims, and importantly, an implied acknowledgment of the crime. As the Court summarized in <u>Schlesinger I</u>:

> After the fire the Defendant told his son Sam Schlesinger to put together a "nice claim" that included all the old and new fabric. The fire had been confined to the third floor where there was no valuable machinery to damage. The Defendant submitted two fraudulent estimates in the insurance claim made to Atlantic Mutual with regard to machines that were never damaged. In addition, the Defendant told his brother Jack to take it slow in restarting the business because insurance adjusters needed to come

and evaluate the damage. All of this evidence demonstrates a motive to commit arson and to steal money from the insurance company.

Testimony from both Israel Schwimmer and Victor Schlesinger showed that the Defendant impliedly acknowledged the criminal act and substantiated the motive for the arson. On the first day that the Defendant and his employees were able to return to the factory, two witnesses overheard the Defendants son David exclaim "job well done." Schwimmer testified that the Defendant replied, "[w]e will wait for the claim that is going to go through." This exchange was described as joyful and occurred shortly after the fire and while the declarants were under an area of extensive damage. A reasonable juror could conclude from these statements, beyond a reasonable doubt, that the Defendant had knowledge and involvement in aiding and abetting or causing the fire.

Id. at 723–24.

Fourth, there was substantial evidence that the petitioner had both the opportunity and means to commit the crime. As the Court summarized in <u>Schlesinger I</u>:

The Defendant was the last person to leave the factory that night. After a thorough investigation, Fire Marshal Santangelo concluded that the Defendant and his brother Jack were the only two individuals who had access to the outside entrances and the third floor. Undisputed testimony from Fire Marshal Santangelo and the firefighters at the fire scene established that all of the outside entrances as well as the entrance to the third floor shipping area were locked upon arrival of the first fire companies. There was no evidence that a perpetrator broke into the factory or could have gained entry through the locked doors. Based on this evidence, a reasonable juror could conclude, beyond a reasonable doubt, that the Defendant was one of only two people who had the access to start the fire in the third floor of the tightly locked factory.

Id. at 723. Even assuming the fire was classified as "undetermined", in light of all of the other circumstantial evidence of the petitioner's guilt, the fact that the petitioner was one of only two people who could have started the fire is significant.

Finally, as the Court noted in <u>Schlesinger I</u>, "there was evidence that the [petitioner] conducted himself in such a manner after the fire so that a reasonable juror could infer a consciousness of guilt." <u>Id.</u> at 724. As the Court further stated:

> Here, although it may not rise to the level of consciousness of guilt that flight represents, the jury had the right to consider evidence that Schlesinger acted in a suspicious manner when questioned about the fire by Fire Marshal Santangelo. After repeatedly delaying his interview with Fire Marshal Santangelo, the Defendant surreptitiously tape recorded the interview. His responses were described as evasive and accusatory. The Defendant denied involvement in Private Brands and stated that he only recalled one other fire in the building in 1991. Moreover, his description of his involvement in Goodmark Industries as a "Manager of Financial Operations" was misleading. In fact, the evidence showed that the Defendant and his brother owned and controlled every aspect of Goodmark Industries and Private Brands, and that there were three previous fires in the factory. The jury was entitled to infer consciousness of guilt from the facts surrounding the surreptitious recording, the evasive behavior, and the misleading statements.

<u>Id.</u>

The only case with comparable circumstantial evidence to the instant case was <u>Richey</u>. However, in that Sixth Circuit case, the only circumstantial evidence linking Richey to the fire was the testimony of witnesses "some of whom might have had their own motives for implicating Richey". 498 F.3d at 364. While this may be true of the testimony of Israel Schwimmer and Victor Schlesinger, this is not the case with the circumstantial evidence established by Weiser's testimony, the fraudulent insurance claims, and Schlesinger's behavior following the fire indicating a consciousness of guilt. Thus, the circumstantial evidence in the instant case was stronger than that in <u>Richey</u>. Moreover, because the circumstantial evidence supporting the arson conviction did not solely rely on direct evidence of victim testimony, this case is distinguishable from <u>Lindstadt v. Keane</u>, 239 F.3d 191 (2d Cir. 2001), <u>Eze v. Senkowski</u>,

321 F.3d 110 (2d Cir. 2003), and <u>Pavel v. Hollins</u>, 261 F.3d 210 (2d Cir. 2001), three sexual abuse cases relied on by the petitioner in which the Second Circuit held that failure to consult or call a medical expert was an error that, in combination with other errors, amounted to ineffective assistance.

In addition, in <u>Richey</u>, the petitioner's proffered arson experts would have testified to a "most likely" cause of the fire that was accidental. Here, even if trial counsel could have more sufficiently rebutted the conclusion that the fire was incendiary, at most the trial counsel could have argued to the jury that the cause of the fire was unknown. As the petitioner's expert Dennis Smith states in his affidavit, because no causes of the fire were identified "the fire cause can only be classified as 'undetermined'", which Smith explains is the appropriate classification "whenever the cause cannot be proven to an acceptable level of certainty". (Dennis Smith Aff., ¶ 53.) Although the petitioner's experts point to flaws in the government experts' methodology and suggest other non-incendiary ignition sources that were not considered, they do not identify a "most likely" cause or state to any degree of certainty that the fire was not incendiary. In this regard, the Court finds the recent unpublished opinion in <u>Thompson v. United States</u>, 436 F. App'x 669 (7th Cir. 2011) to be illustrative.

In <u>Thompson</u>, the Seventh Circuit upheld the denial of a habeas petition by a petitioner convicted of, among other crimes, use of fire to commit a felony in connection with a fire at his home that resulted in his mother's death. At the trial, Thompson's counsel chose to pursue a suicide defense rather than a non-arson defense. Similar to the instant case, the petitioner alleged that his trial counsel was ineffective because they "failed to make a reasonable investigation regarding the cause of the fire, and accepted [the government's arson expert's] conclusions without consulting an independent expert." 436 F. App'x at 673. With respect to the

42

performance prong of the <u>Strickland</u> analysis, the court held that, in contrast to <u>Dugas</u> and <u>Richey</u>, trial counsel's performance did not fall below a standard of reasonableness because trial counsel was not pursuing a non-arson defense. In addition, the court held that the petitioner failed to meet the prejudice prong of the <u>Strickland</u> standard because at most, Thompson's proposed expert would have concluded that "the cause of the fire was 'undetermined'" and "there was plenty of other evidence from which a rational jury could find that [petitioner] caused the fire". <u>Id.</u> at 675 (internal quotation marks omitted). The court ultimately held that, under the facts of the case, the circumstantial evidence prevented a finding of prejudice.

Here, the petitioner's proffered arson experts similarly conclude that the cause of the fire was "undetermined". Moreover, as in <u>Thompson</u>, there was "plenty of other evidence from which a rational jury could find that [Schlesinger] caused the fire." 436 F. App'x at 675. As stated in detail above, Schlesinger had a significant monetary motive in the form of insurance proceeds, the means and opportunity to commit the crime, impliedly acknowledged the commission of the crime, and acted in a manner subsequent to the crime consistent with a consciousness of guilt. In light of the overwhelming circumstantial evidence of the petitioner's guilt, there is no reasonable probability that consultation with an arson expert or calling an arson expert to testify would have affected the outcome of the trial.

As a result, the Court finds that there was no violation of the petitioner's Sixth Amendment rights, and therefore denies his petition for a writ of habeas corpus. <u>See</u> <u>Narrod v. Napoli</u>, 763 F. Supp. 2d 359, 385 (W.D.N.Y. 2011) (denying habeas petition where petitioner alleged that the court erred in admitting testimony of arson expert that the fire was intentionally set based on a negative corpus theory, and stating "in light of the overwhelming evidence that the fires were not mere happenstance, the conclusion is inescapable that Narrod deliberately set the

fires in the victim's house in furtherance of his ultimate intent to set the entire house ablaze. Thus, the admission of the objected-to testimony by the arson investigator, even if erroneous, was not so material as to result in a violation of Narrod's right to a fundamentally fair trial."); United States v. Martin, No. 05-CR-28, 2011 WL 836926, at *7 (W.D. Va. March 3, 2011) ("While the Court recognizes that "Martin's defense depended on [the defense's] ability to convince the jury that the government's experts might be wrong in concluding that the fire [w]as 'arson,'", there was copious evidence introduced at trial from which a reasonable jury could find Martin guilty, even if a defense expert had testified to the contrary. Because Martin cannot demonstrate that her counsel's actions prejudiced her, this claim must be dismissed."); King v. State, 290 Ga. App. 118, 125, 658 S.E.2d 883 (Ga. App. 2008) (denying habeas petition on grounds that counsel was ineffective for failing to consult and cross-examine the state's arson expert "with a fire investigation manual or treatise", for a lack of prejudice, because, even without the testimony of the arson experts—who testified that the fire was likely caused by an accelerant but admitted he did not know specifically what caused the fire—"the jury heard that the building was very old, had no electricity or gas connected to it, and was not used to store chemicals; that [petitioner] was the only person in the vicinity when [a witness] noticed the building was burning; and that he had prior difficulties with the owner's daughter"); cf. Michigan Millers Mut. Ins. Corp. v. Benfield,140 F.3d 915, 922 (11th Cir. 1998) (holding that, even excluding the testimony of a cause and origin expert that a fire was intentional based on the negative corpus methodology, a directed verdict for the defendant on an arson charge was reversible error because a reasonable jury still could have found from circumstantial evidence that there was "an incendiary cause of the fire"); Ferranti v. United States, No. 05-CV-5222, 2010 WL 307445, at *14 (E.D.N.Y. Jan. 26, 2010) (denying a petition to file a successive

petition pursuant to 28 U.S.C. § 2244(b) based in part on new evidence by an arson expert refuting the state's experts testimony that the fire was incendiary, holding that "although [the expert's] testimony may refute the evidentiary value of the burn patterns, [the expert] does not expressly rule out the possibility of arson, and there is ample other evidence of Ferranti's guilt. Indeed, after reviewing the uncontradicted compelling evidence of Ferranti's motive, intent and consciousness of guilt, I cannot conceive of a jury finding him not guilty.")

### III. CONCLUSION

For the foregoing reasons, it is hereby:

**ORDERED**, that Schlesinger's petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2255 is denied, and it is further

**ORDERED**, that the Clerk of the Court is directed to close this case.

**SO ORDERED.**
Dated: Central Islip, New York
February 6, 2012

_/s/ Arthur D. Spatt_
ARTHUR D. SPATT
United States District Judge